LARRY *v*. DETROIT & MACKINAC RAILWAY CO.

**1.** MASTER AND SERVANT — FELLOW-SERVANT — INCOMPETENCY — RAILROADS.

Evidence tending to show that defendant's locomotive engineer, whose negligence caused a collision, had on one occasion permitted his fireman to partly smother the fire; that afterwards the fireman forgot to shake down the fire, and on another occasion the engineer ran past a stop which he was ordered to make, but furnished a reasonable excuse therefor; and that he had been in defendant's employ as en-

gineer about a year, is insufficient to establish his incompetency.[1]

2. SAME.

While a single act may, under some circumstances, show an individual to be an improper and unfit person for a particular service, as when he acts wantonly or maliciously, yet a single act of casual neglect does not sufficiently establish that a servant was incompetent.

Error to Arenac; Sharpe, J.  Submitted June 20, 1911.  (Docket No. 43.)  Decided November 3, 1911.

Case by Douglass Larry against the Detroit & Mackinac Railway Company for personal injuries.  Judgment for plaintiff.  Defendant brings error.  Reversed.

*Charles R. Henry* and *Guy D. Henry* (*James McNamara*, of counsel), for appellant.

*Hall, De Foe & Henry*, for appellee.

MOORE, J.  On the 12th day of April, 1907, the regular afternoon passenger train going north left Posen station one and one-half minutes late. It had the right of way. This train is due to leave Posen at 4:58 in the afternoon, and to arrive at Metz at 5:08 in the afternoon.  On the afternoon in question the plaintiff was fireman on an engine in charge of Fred Markey as engineer.  This engine was ordered to run from Tower, a station on the defendant's road 31 miles north of Posen, to Alpena.  This engine started south.  The passenger train was running from 45 to 50 miles an hour.  The engine was running from 35 to 40 miles an hour.  Metz was one of the stations between Posen and Tower, and was 5.3 miles north of Posen and 26 miles south of Tower.  Between Metz and Posen there was a curve in the road.  This curve was about halfway between Posen and Metz, and it was here the collision occurred which caused the injury, for the recovery for which the plaintiff brings this suit.

---

[1]As to duty of master with respect to employment of competent fellow-servants, see note in 48 L. R. A. 369.

It was the claim of the plaintiff that the engineer was incompetent, and the defendant had or should have had knowledge of his incompetency. The case was tried before a jury, which answered three special questions, as follows:

"*First.* Did not Larry's conduct and negligence contribute to the occasion of the collision?" Answer: "No."

"*Second.* Did Bolen have authority over the engineer and fireman so that he could hire or discharge them or direct their conduct other than as conductor, when acting in that capacity?" Answer: "No."

"*Third.* Does the fact that Larry smothered the fire on one occasion and failed to keep the steam up on another time by not shaking the fire sufficiently constitute incompetency on the part of Markey?" Answer: "Yes."

The jury returned a general verdict in favor of the plaintiff. The case is brought here by writ of error.

Counsel are substantially agreed that the following legal questions are involved:

(1) Was there any evidence to go to the jury of Markey's incompetency?

(2) Was there any evidence upon which the jury could find that the defendant had notice of such incompetency?

(3) Was plaintiff chargeable with contributory negligence as a matter of law?

The first of these questions we deem to be the most important one. Counsel for plaintiff insist there was testimony of the incompetency of the engineer sufficient to carry the case to the jury. Counsel for the defendant insist to the contrary. The following appears in the record:

"It is conceded that Fred Markey had acted as an engineer for the D. & M. for one year prior to the time of the accident."

Mr. Markey was not a witness upon the trial. The plaintiff commenced work for the defendant railroad company March 8, 1907. He had never been employed by a railroad company, and knew nothing about a locomotive engine before that date. About the 4th of April the

plaintiff fired upon an engine with Markey as engineer from East Tawas to Alpena Junction, a distance of 65 miles. He then fired the same engine 5 or 6 round-trips to Tower, a distance of 49 miles. About 11 or 12 o'clock of the day in question the plaintiff and Engineer Markey were directed to go from Alpena to Onaway with an engine. The plaintiff claims that the first knowledge he had of an impending collision was the jumping of Markey from his seat. He saw Markey take hold of the lever to reverse the engine, but could not say whether he moved it or not. The plaintiff was standing in the gangway as Markey jumped from his engine. The plaintiff ran onto the tank as the collision took place. After the collision the plaintiff saw Markey coming up the track.

The testimony of the incompetency of the engineer is almost wholly the testimony of the fireman, and is as follows:

"I don't remember Markey giving me any directions relative to the manner of firing the locomotive.

"*Q.* Was there any circumstances took place on the first trip—

"*A.* Yes, sir.'

"*Q.* In connection with Mr. Bolen and Mr. Markey and Mr. Markey's treatment of the engine?

"*A.* Yes, sir.

"*Q.* What was that?

"*A.* Our engine was on the Cleveland branch, back of Tower. Mr. Markey and Mr. Bolen had a talk. We were cleaning the fire and taking water at the same time. When we got our engine up to Tower, we went on the branch with the cars, and spotted them for them to load, and just before noon, I think it was, we went down to clean the fire. We went down where there was a little water hole to take water. While down there it was discovered that there was not very much live fire. We were there maybe half or three-quarters of an hour. I saw Bolen come down after we were there. Mr. Bolen asked why we were taking up so much time, and Mr. Markey spoke up something about the fire was not going. I didn't know how to fire. Bolen asked him why he didn't show me. All Bolen told Markey was to learn me how to fire.

I didn't know how to fire. I had only fired two or three days. The trouble with my fire was that there was too much coal on it. I had fed it too much coal. Engine running light, and I didn't know how to fire, kept throwing in coal and choking it down. Markey saw me. He was right there. Running the engine was all he was doing. I finally got my fire up, and we went back to load up ties. Bolen took charge of all the operations in there loading ties, and directed us where to go. * * * Take the second occasion, we had further trouble about firing my engine. I could not say where it was. It was somewhere on the road going to Alpena. Markey had not instructed me in any way how to fire after Bolen had told him. The second occurrence was where the steam got low, and we could hardly get along. I think Bolen was riding in the engine. He asked Markey something about why there wasn't any steam and told him to let him run the engine, and he did and I fired, not very far, perhaps two or three miles, where Bolen had to get out and unload the ties. Bolen instructed me some how to fire. The result was that I got along with reference to making steam. * * * The day before the accident we were running from Tower to Alpena. I know where Metz and Posen are. As the train reached Metz that day Bolen was conductor. I don't know where he was on the train. He wasn't in the cab. * * * With reference to air and air appliances, our train had air on the train line and steam on the engine. We operated the air from the engine. We reached Metz coming south about 4 o'clock on the 11th—between 4 and half past. I don't remember whether Markey stopped as he came to Metz, or whether he kept right on going. We were going by the station when Bolen stopped us. The train was in motion. Bolen stopped us by shutting the air from the rear of the train by opening an angle cock on the back of the train. This is an emergency application. * * * Our engine and train was better than half the length of the train, I should think, seven or eight cars from the station at Metz at that time. The side track at Metz that you should run into in order to meet and pass the train coming from the south was about a train length and a half back of us towards Tower. There was no other side track south of Metz and between Metz and Posen, where your train could side track. After the train was stopped, Bolen came to the engine. He asked Markey where he was going for

No. 3, what he was pulling by for. I don't remember what Markey said. Whether he said anything or not I could not say. Bolen was mad, and said something about he would get fired. I don't know exactly what he said. I have said all I can remember about it. One could see about a mile south from Metz, and then the track curved out of sight, as I remember it. After Bolen came to Markey and asked him what he was going to do about No. 3, or something, we backed into the side track, and waited for No. 3 to go by. I don't think it was over 5 or 10 minutes that we waited before No. 3 came. No. 3 is the train that was in the record yesterday. I think it was on time that day. I ran with Markey after this day."

On the cross-examination, the plaintiff testified in part as follows:

"I first started out to become a fireman. I was going in the railroad business. I took an examination. I studied for it. I was on the train. I was not under pay during these first three trips. Charles Zink was with me and instructed me. He told me how to build my fire and how to coal. He explained to me how to keep the fire going. After this I didn't know whether I was competent to fire or not. I was willing to try and learn. This was along early in March. Just two trips before I started with Markey was all I ever fired. I was with him five or six days before the accident. * * *

"*Q.* Did you ever have any trouble excepting on those two occasions that you had named when your fire went out?

"*A.* No, sir.

"*Q.* Now, the first trouble that you had was because you put in too much coal, is that right?

"*A.* Yes, sir.

"*Q.* What was the next trouble?

"*A.* The next trouble was the time the steam went down on the road. I don't know what caused that. I know now that this last time the trouble was because I didn't shake it and keep the fire clean. I know it was necessary to shake it to keep the fire going. It was three or four days before I was injured that I failed to shake the coal down sufficiently.

"*Q.* The only difficulty you had was because first you put in too much coal? .

167 MICH.—25.

"*A.* Yes, sir.

"*Q.* And smothered your fire?

"*A.* Yes, sir.

"*Q.* How long did it take you to learn you should not do that?

"*A.* Well, it didn't take me very long after I found out what was the cause.

"*Q.* And the second trouble you had was because you didn't poke it; shake it enough and stir up the fire?

"*A.* Yes, sir.

"*Q.* How long did it take you to learn that?

"*A.* Well, it didn't take me very long.

"*Q.* Now, do you mean that in all the experience you have had, and in all the education you got when you were qualifying, that you were not told about stirring up the fire and shaking it?

"*A.* I was told, but I was not told how often it needed it.

"*Q.* Before that you had succeeded in getting along and had shaken it the required number of times, hadn't you?

"*A.* I got along all right; yes.

"*Q.* You never had any trouble with the fires at all during all of the time you fired, excepting these two times?

"*A.* No; that is all.

"*Q.* And one was when you smothered it and when you didn't poke it enough?

"*A.* Well, there was another time, if I ain't mistaken. It was a time when we was leaving in the Alpena yard. Mr. Richardson was acting as conductor. The blower was on and Markey told me to shut the blower off. I told him the fire would go out if I did, and he told me, let go, and I shut it off, and, when we got ready to start up, the fire was gone. That was the night before the wreck, I think. I don't remember Markey instructing me on occasions when I choked the fire down and when I didn't poke it enough. The only thing Markey did on these two trips was not to tell me. * * * I went back firing something like three weeks after. I worked until November some time, most of the time in the yard at Bay City.

"*Q.* I want to ask you once more, because I want to be definite about this. Aside from having put in too much coal at one time and thereby smothering your engine, and aside from not clearing it up sufficiently, nothing ever

occurred until the wreck when Markey was there that was defective in your firing?

"*A.* Not about the firing; no.

"*Q.* And, after you had once made the mistake by putting in too much coal and smothering it, you did not repeat this mistake, did you?

"*A.* Not as I remember; no.

"*Q.* And, after you had failed this time to sufficiently poke and stir the fire you did not make that mistake again, did you?

"*A.* Why, I might have once or twice.

"*Q.* Now, then, Mr. Larry, so far as this second offense is concerned, it all depends on whether the fireman is lazy or whether he is diligent, doesn't it?

· "*A.* Yes, sir; I suppose. I don't know. I suppose it is.

"*Q.* Aside from those two things, you never knew of Fred Markey doing anything that was not right in line with his duty as engineer?

"*Mr. Hall:* Just the firing, do you mean, Mr. Henry?

"*Q.* All of those that you have related?

"*A.* Just firing.

"*Q.* Well, whatever you have related?

"*A.* Well, I know of him going to sleep in the engine.

"*Q.* When it was running?

"*A.* No, sir.

"*Q.* Well, tell me in what way that is a defect?

"*A.* Why, as quick as his engine would stop, he would prop himself up and go to sleep.

"*Q.* Wherein Fred Markey was deficient. Now, why do you charge him with defect in those things, not keeping the fires right?

"*A.* Because I think he should have learned me more, try to learn me, which he did not try to do."

Mr. Bolen's version of the transaction at Metz is as follows:

" I was standing on the flat cars, and, when we was going through Metz, I thought he was going a little too fast, so I swung him up and he did not see me, and I reached for the air and set the air on him. This stopped the train. I got off and went back and went into the telegraph office and I got a train order there to meet No. 45 at Posen. When I got down to the engine, I asked him what he was trying to do by pulling by the station at

Metz, and he said he was figuring on backing in at Metz on the south end of the station. Well, I could say no more. All right, if that is what you are figuring on. But when we was at Metz, just about that time we got at Metz, No. 45 would be due out of Posen in about five minutes, and we got a train order there to meet her at Posen, and we went to Posen for that train.

"*Q.* At any time while Markey was acting for your company did you ever have any knowledge of anything which he did inconsistent with a competent engineer?

"*A.* No, sir.

"*Q.* Who had charge at that time of the train crew, including the engineer and fireman, who was directly over them?

"*A.* Well, the trainmaster was over them. Mr. Philip Richardson was trainmaster at that time. I never at any time communicated with him or with any officer of the road of any incompetency of Markey or Larry.

"*Q.* Did you find after you had spoken to Markey on this 11th of April that there were cars on the north end of this side track so that would be the only way he could get in there?

"*A.* Yes, sir; there was two cars loading with bark. There was one loaded and one partly loaded.

"*Q.* So in going into the side track it was the only thing he could do?

"*A.* Was to go ahead and back in.

"*Q.* Now, at the time you stopped him, how far was the rear of his train from the south end of the side track?

"*A.* Well, his engine was over the switch and the way car was three or four lengths by the depot station.

"*Q.* And he had not got far enough along yet to back in?

"*A.* Oh, no, no; I stopped him."

On the cross-examination he testified:

"*Q.* Well, you thought yourself that he had neglected to see you signal, didn't you?

"*A.* No; I did not. I pulled the emergency brake because I wanted to stop him.

"*Q.* Well, he would not stop you say until he got still further down?

"*A.* Well, because he figured on backing in, and I didn't know he was figuring on that. I first learned that he intended to back in when he told me.

"*Q.* You were in charge of the train, were you not?

"*A.* Yes, sir.

"*Q.* And you were the one to tell him where to stop, weren't you?

"*A.* No; he had just as much to do as I did. I had charge of the train.

"*Q.* Now, as a matter of fact, Mr. Bolen, don't you know that you went down to Markey and criticised him for attempting to run by here in view of the approaching train?

"*A.* I asked him—

"*Q.* Just answer my question.

"*A.* Yes, sir. I don't know where Mr. Richardson was. The day before he rode with me on the tie train from Millersburg or Onaway down to Metz.

"*Q.* You deny having said you will be fired for this?

"*A.*- Yes, sir. I never said that. I never said that."

Mr. Henry T. Thomas, sworn for defendant, testified:

"*Q.* Did you employ Frederick Markey as engineer?

"*A.* I did.

"*Q.* And Douglass Larry as fireman?

"*A.* I did.

"*Q.* What have you to say as to the competency as an engineer of Frederick Markey?

"*A.* About what?

"*Q.* Competency, as to his ability, as to his competency?

"*A.* I considered him at that time fair.

"*Q.* What experience on April 12, 1907, had Markey, how long had he worked as engineer?

"*A.* I could not answer that question without looking up the record.

"*Q.* Do you pass upon the competency of engineers in the employment of your company?

"*A.* Largely.

"*Q.* Who, aside from yourself, has the employment of engineers and firemen?

"*A.* No one.

"*Q.* Prior to April 12, 1907, had any one informed you of any act on the part of Mr. Markey while running his engine with Mr. Larry that were not competent acts?

"*A.* I do not remember of one instance of anybody making any such report."

Cross-examination by Mr. Hall:

"If any reports were made of the men, I have a record. I have not looked up the record to see what it is as to Mr. Markey.

"*Q*. So you don't know what is on that record, do you?

"*A*. If there was anything grievous in that record, I would remember it. My recollection is that there is nothing in the record bearing on his competency.

"*Q*. Have not you got on your record that he was laid off at one time because of the fact that he had caused a collision at Saginaw river bridge?

"*A*. It may be there.

"*Q*. It may be there? Well, was not he, as a matter of fact, laid off prior to this because of a collision of engine and cars at the Saginaw bridge?

"*A*. He may have been laid off.

"*Q* Now, Mr. Thomas, if it was true that on April 11, 1910, or 1907, in face of a train about due at Metz when he was running south, that he failed to observe a signal given and the emergency had been applied, or the appliance used for the emergency, and he was brought to a stop, then he was remonstrated with, as to what he intended to do, and he made no reply, and he was reprimanded by the one in charge of the train, would you regard that as evidence of incompetency?

"*A*. I think I testified in regard to my opinion as to his competency previous to that accident.  *  *  *  I did not produce the record of Mr. Markey because I have not been asked for it."

Mr. Allen, a witness for the plaintiff, testified in part as follows:

"Relative to the choking down of the fire, I don't see how this could be occasioned by the work of a competent engineer and fireman. Every employé is liable to make a mistake. If Larry was firing and permitted the fire to be choked by putting on too much coal, I should judge that it was his fault from inexperience. As soon as the engineer discovered it, I think it would be his duty to instruct the fireman what to do; but in the first instance it is the duty of the fireman to see the thing does not occur. In my long years of experience I have had firemen who committed that mistake while I was competent to run the engine. The fireman has one thing to do and the engineer has another. The duties of the engineer are to see that every part of the engine is in running order.

The fireman is supposed to know how to fire and take care of his fire. The engineer cannot watch the fireman constantly. When an engineer is running his engine, it is his duty to watch out. His mind is directed ahead when he is running ahead for obstacles or anything that might be in his path. I would not regard an engineer incompetent whose fireman permitted twice within two days his fire to be choked or go out."

We have quoted every word of the testimony bearing upon the question of incompetency.

In Evansville, etc., R. Co. v. Guyton, 115 Ind. 450 (17 N. E. 101, 7 Am. St. Rep. 458), the following language is used in the opinion:

"There was some testimony, however, from which the jury may have found that he was not possessed of sufficient familiarity with the time cards, and with the technical language of train orders, and was not sufficiently quick of apprehension to be able to construe and interpret an order in connection with a time card so as to be competent to act as the conductor of a wild train.

"In view of the fact that Stice had been promoted to the position of conductor but recently before the accident, and that more than ordinary vigilance and aptitude were required for the control and safe management of trains such as the one he was intrusted with, and in view of the further fact that there is good evidence which tends to show that, contrary to the requirements of the general rules of the company, Stice had been assigned to duty as a conductor without the usual inquiry or examination in respect to his qualifications, we are constrained to hold that the evidence tends to support what the jury must have found, viz., that Stice was incompetent to act as conductor of a wild train, and that the railroad company was remiss in its duty in selecting him for that service.

"While the railroad company, in relation to the plaintiff, was not bound to guarantee the absolute fitness of the conductor, it was its duty, nevertheless, to exercise reasonable and ordinary diligence, having respect for the exigencies of the particular service required, to the end that it might ascertain the qualification and competency of the conductor, and whether or not he was fit to be intrusted with the responsible station to which he was assigned.

*Wabash R. Co.* v. *McDaniels,* 107 U. S. 454 (2 Sup. Ct. 932); Patterson on Railway Accident Law, p. 313.

" In employing its subordinates it was the duty of the company to exercise a degree of care commensurate with the responsibilities of the position in which they were to be placed, and with the consequences which might ensue from incompetence or unskillfulness on the part of those employed. In case peculiar fitness was required, or special qualifications demanded for the service to be performed, unless it was assured by the previous like service of the conductor of his fitness, the duty of the company required it to institute affirmative inquiries in order to ascertain his qualification in that regard.

" In case an employé proves to be incompetent for the duty assigned him, and ordinary care has not been used in his selection, or if he be retained after notice of his incompetency, the employer will be liable to a co-employé, whose injury results proximately from the lack of qualification of the fellow-servant, unless the person injured had notice of the incompetency, or had equal opportunities with the employer to obtain notice. *Pennsylvania Co.* v. *Roney,* 89 Ind. 453 [46 Am. Rep. 173]; *Lake Shore, etc., R. Co.* v. *Stupak,* 108 Ind. 1 (8 N. E. 630); *Pittsburgh, etc., R. Co.* v. *Ruby,* 38 Ind. 294 [10 Am. Rep. 111]; *Chapman* v. *Railway Co.,* 55 N. Y. 579; *Mann* v. *Canal Co.,* 91 N. Y. 495; *Baulec* v. *Railroad Co.,* 59 N. Y. 356 [17 Am. Rep. 325]."

In that case it was held that, because Mr. Stice had been a competent brakeman and fit for promotion, it did not follow that he was also competent to take charge of and run a wild train. In *Baulec* v. *Railroad Co.,* 59 N. Y. 356 (17 Am. Rep. 325), it is said, in part:

" The duty of a railroad corporation is to exercise due —that is ordinary—care in the selection and employment of its servants and agents, having respect to their particular duties and responsibilities, and the consequences that may result from the want of competence, skill, or care in the performance of their duties. If, without exercising such care and caution, employés and agents are selected who are incompetent, or in any respect unfitted for the position, and harm and loss come to others by reason of such incompetency or unfitness, the corporation must answer for their neglect and want of care in employing a

servant incompetent or untrustworthy.  *  *  *  If it be conceded that the negligence of McGerty upon the prior occasion is established, it by no means follows that the defendant was bound to discharge him upon peril of being charged with neglect and a want of due care in retaining him in its service.  An individual who by years of faithful service has shown himself trustworthy, vigilant, and competent is not disqualified for further employment, and proved either incompetent or careless, and not trustworthy, by a single mistake, or act of forgetfulness, and omission to exercise the highest degree of caution and presence of mind.  The fact would only show what must be true of every human being, that the individual was capable of an act of negligence, forgetfulness, or error of judgment. This must be the case as to all employés of corporations until a race of servants can be found free from the defects and infirmities of humanity.  A single act may under some circumstances show an individual to be an improper, unfit person for a position of trust, or any particular service, as when such act is intentional and done wantonly, regardless of consequences, or maliciously.  So the manner in which a specific act is performed, may conclusively show the utter incompetency of the actor, and his inability to perform a particular service.  But a single act of casual neglect does not, *per se*, tend to prove the party to be careless and imprudent, and unfitted for a position requiring care and prudence.  Character is formed and qualities exhibited by a series of acts, and not by a single act.  An engineer might, from inattention, omit to sound the whistle, or ring the bell at a road crossing, but such fact would not tend to prove him a careless and negligent servant of the company.  The company is only charged with the duty of employing those who have acquired a good character in respect to the qualifications called for by the particular service, and no one would say that a good character acquired by long service was destroyed or seriously impaired by a single involuntary and unintentional fault.  *Murphy* v. *Pollock*, 15 Irish C. L. 224.  But this appeal does not necessarily depend upon the correctness of this view of the effect to be given to a single instance of neglect.  All that the corporation defendant was bound to do, after the occurrence, was to inquire into it, and ascertain the facts, and act in the discharge or retention of the switchman with reference to the facts as ascertained, as reasonable prudence and care should dictate,

and, if such care and caution was exercised, the company is not liable, although its general agent erred in judgment in retaining the switchman in the same service. Ordinary care and a reasonable exercise of discretion and judgment is all that is necessary to absolve the corporation from the charge of neglect of duty in such a case.

"The transaction upon which stress is laid, and by force of which it is now sought to charge the defendant with the consequences of the servant's neglect on this occasion, and the agency of the switchman in causing the accident on that occasion, was investigated immediately thereafter by the agent of the defendant whose general duties included such investigation, and who was authorized to employ and discharge switchmen at that point. He had the statement of the switchman himself, and in this record we have his sworn statement of the same transaction, and assuming, as we must, that the facts disclosed upon this trial were made known to the agent and representative of the defendant, then it was certainly a question of doubt whether the fault of that accident was upon the switchman or the engineer in charge of the train that was thrown from the track."

The court held that there was not sufficient evidence to carry the case to the jury. In *Holland* v. *Southern Pacific Co.*, 100 Cal. 240 (34 Pac. 666), the following language is used:

"It was shown upon the trial that some three or four months prior to the collision resulting in the injury complained of by the plaintiff, Mulligan was the engineer in charge of one of defendant's trains running between Marysville and Oroville, and upon that occasion ran a train between Marysville and Moore's station, a distance of 12 or 14 miles, in 40 minutes, while the schedule time between these points was one hour. The plaintiff himself testified that in making about $1\frac{1}{2}$ miles of this run, over a portion of the road which was level, the train was driven at a speed of about 40 or 45 miles an hour; and he further testified that this road was not considered safe to run fast upon, because it was laid with light iron rails. There was but one train a day run over this road, but handcars used by construction men might have been upon the track at this time, and under the rules of defendant would have had the right to remain there until within 10 minutes of

the schedule time for the arrival of the regular train. This run was made in daylight, and without accident or injury to any one. The plaintiff, although requested by Mulligan not to do so, notified the proper officers of defendant of the manner in which this train was run upon the occasion just referred to.

"This was all the evidence tending in any degree to show the incompetency of Mulligan as an engineer prior to the collision in which plaintiff received his injuries. Counsel for plaintiff in the very able brief filed in this court argue that this evidence was sufficient to show that Mulligan knew, or ought to have known, that it was dangerous to run a train so fast upon this particular road, and that in so doing he not only endangered the lives of the passengers on the train, but also imperiled the lives of the section or construction men who were on the road, and who had the right to remain there until within ten minutes of the time for the regular approach of the train, and that the jury were justified in finding from this single act of Mulligan that he was reckless and careless to such a degree as to render him wholly incompetent as an engineer, and that the defendant could not, with notice of the incompetency thus shown, retain him in its service as an engineer without rendering itself liable to those of its employés who might thereafter be injured through his negligence. But we do not think so. It may be and doubtless is true that a single act may be such as to furnish an unerring index of the character of the actor, and, when considered by itself or in connection with the circumstances surrounding it, be sufficient to demonstrate the unfitness of a person to be placed in any position requiring great or even ordinary care in the discharge of its duties. Still, the act relied upon here was not of a character to necessarily stamp Mulligan as unfit or incompetent to discharge the duties of an engineer. It did not of itself show him to be a grossly careless person, or reckless of the lives, either of the passengers committed to his charge or the lives of the employés of defendants at work upon the track. No accident occurred at that time, nor is there anything in the evidence to show that this result was due more to chance or good fortune than to the management of the engine and the actual condition of the road upon which the train was running; and, although men were liable to have been working on the track, it does not appear that they could not have been easily seen, and would

not have had ample time to escape all harm after being warned by bell or whistle of the approach of the train. Upon the facts disclosed by the evidence, the jury was not warranted in finding that the defendant failed in its duty to plaintiff or its other employés in not discharging Mulligan from further service as an engineer because of this one act, assuming it to have been a negligent one. The true rule upon this subject is stated with great precision and clearness by Allen, J., in delivering the opinion of the Court of Appeals of the State of New York in the case of *Baulec* v. *Railroad Co.*, 59 N. Y. 363 (17 Am. Rep. 325), as follows."

The court then quoted from the opinion in *Baulec* v. *Railroad Co.*, and then proceeded:

"And in Wharton on Negligence, § 238, it is said:

" ' If single exceptional acts of negligence should prove an officer to be incompetent, no officer could be retained in service, for there is no person who is not at some time to some degree negligent. Hence, it has been properly held that intelligent men of good habits, who are engineers, or brakemen, or switchmen on railroads, are not necessarily to be discharged by their employers for the first error or act of negligence such employés commit, nor will railroad companies necessarily be liable for a second error or negligent act of a servant to all other servants of such companies, when the latter sustain damages by reason thereof.' "

In Bailey on Master's Liability, p. 48, it is said:

" Liability on the part of an employer for an injury caused by the incompetency of a fellow-servant depends upon its being established by affirmative proof that such incompetency was actually known by the master, or that, if he had exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.

" When, however, it is not shown but that due care was exercised in the choice of a servant, no presumption of the latter's unfitness arises afterwards. The presumption is that, if competent and fit when he enters the service, he remains so.

" The master, in the exercise of his duty of supervision over the conduct of his servants, to ascertain whether they should be retained, must consider the nature of the service, as well as the dangers attending the employment or re-

tention of unfit or incompetent persons. A closer supervision over the habits and conduct of an engineer is required than over a common laborer for the very plain and obvious reason that the dangerous consequences of neglect are likely to be so much greater in the one case than in the other. The greater the danger, the greater the care, is the rule.

"The presumption is that the master has exercised proper care in the selection of the servant. It is incumbent upon the party charging negligence in this respect to show it by proper evidence. This may be done by showing specific acts of incompetency, and bringing them home to the knowledge of the master or company; or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. But such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of. So it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they did come to the knowledge of the master, or would have come to his knowledge if he had exercised ordinary care. In such case the presumption that the master had discharged his duty may be overcome to such an extent as to call upon him to rebut the proof made showing his negligence."

In a note on page 64, *Id.*, the following is said:

"When a master employs a competent and careful servant, he has a right to rely upon the presumption that he will continue careful and skillful, and, when notified that he has become careless, he is not ordinarily bound to discharge such servant without an investigation into such charge, unless such notice is accompanied by such evidence as leaves no reasonable doubt of the truth of such charge. A rule that would require the master to discharge a servant, careful and competent when employed, without investigation, upon a charge of carelessness, would be a harsh one, and would often result in great injustice to employés. *Lake Shore, etc., R. Co.* v. *Stupak,* 123 Ind. 210 (23 N. E. 246); *Ohio, etc., R. Co.* v. *Collarn,* 73 Ind. 261 [38 Am. Rep. 134]; *Lake Shore, etc., R. Co.* v. *Stupak,* 108 Ind. 1 (8 N. E. 630); *Indiana, etc., R. Co.* v. *Dailey,* 110 Ind. 75 (10 N. E. 631); *Chap-*

*man* v. *Railway Co.*, 55 N. Y. 579; *Moss* v. *Pacific Railroad*, 49 Mo. 167 [8 Am. Rep. 126]; *Blake* v. *Railroad Co.*, 70 Me. 60 [35 Am. Rep. 297]; *McDowell* v. *Railway Co.* (Ky.), 5 S. W. 413; *La Rose* v. *National Bank*, 102 Ind. 332 (1 N. E. 805)."

At page 67, *Id.*, the text says:

"When the injured servant knew of the incompetency of the offending servant as well as the master, or had equal knowledge, and, notwithstanding such knowledge, continued in the employment without objection, he waives the negligence of the master in this respect."

The note is as follows:

" *Laning* v. *Railroad Co.*, 49 N. Y. 525 [10 Am. Rep. 417]; *Wright* v. *Railroad Co.*, 25 N. Y. 566; *Mad River, etc., R. Co.* v. *Barber*, 5 Ohio St. 563 [67 Am. Dec. 312].

" One of the rules of the common law still in force is as follows: If an employé knows that another employé is incompetent or habitually negligent, or the materials with which he works are defective, and he continues his work without objection, and without being induced by his employer to believe that a change will be made, he will be deemed to have assumed the risk of such incompetency, negligence, or defects, and cannot recover for an injury resulting therefrom. *Kansas Pacific R. Co.* v. *Peavey*, 34 Kan. 472 (8 Pac. 780); *Kroy* v. *Railway Co.*, 32 Iowa, 357; *Laning* v. *Railway Co.*, 49 N. Y. 521 [10 Am. Rep. 417]; *McQueen* v. *Railroad Co.*, 30 Kan. 689 (1 Pac. 139); *Jackson* v. *Railroad Co.*, 31 Kan. 761 (3 Pac. 501); *Assop* v. *Yates*, 2 Hurl. & N. 768; *Hayden* v. *Manufacturing Co.*, 29 Conn. 548; *Mad River, etc., R. Co.* v. *Barber*, 5 Ohio St. 541 [67 Am. Dec. 312]; *United States Rolling Stock Co.* v. *Wilder*, 116 Ill. 100 (5 N. E. 92); *Hatt* v. *Nay*, 144 Mass. 186 (10 N. E. 807); *Lake Shore, etc., R. Co.* v. *Knittal*, 33 Ohio St. 468.

" In *United States Rolling Stock Co.* v. *Wilder*, 116 Ill. 109 (5 N. E. 92), the duty of the servant was thus aptly expressed:

" ' All that the law demands of one thus employed is that he keep his eyes open to what is passing before him, and avail himself of such information as he may receive with respect to the habits and characteristics of his fellow-servants; and if from either of these

sources of information he finds one of them, from incompetency or other cause, renders his own position extrahazardous, it is his duty to notify the master, and, if the latter refuses to discharge the incompetent or otherwise unfit fellow-servant, the complaining servant will have no other alternative but to quit the master's employ. If he does not, he will be deemed to have assumed the extra hazard of his position thus occasioned. The case suggested, it will be perceived, is one of mutual negligence. On the part of the master it is negligence to retain the incompetent servant in his employ. It is, on the other hand, negligence in the complaining servant to continue longer in the master's service, unless he intends to run the extra hazard himself.'"

See, also, 1 Labatt on Master and Servant, pp. 397, 423, 424; *Michigan Central R. Co.* v. *Dolan,* 32 Mich. 510.

If we apply these principles of law to the case in hand, it is not difficult to reach a result. The defendant employed an engineer shown to be fairly competent. He continued in their employ for a year, presumably becoming more competent. It is sought to show him incompetent by proving that the plaintiff upon one occasion overloaded his fire with coal and upon another occasion failed to shake down the fire when he ought. This may have established the fact that plaintiff was an inexperienced fireman, but falls far short of showing such a degree of incompetency upon the part of the engineer as to make it the duty to discharge him.

As to what occurred at Metz: There is no great conflict between Mr. Bolen and the plaintiff as to what occurred, so far as they testify. It is doubtless true that, when Mr. Bolen stopped the train, he supposed the engineer was running past the station at Metz, and was likely to meet the north-bound train; but when he saw the engineer and talked with him, and saw the two cars at the north end of the siding, he was satisfied. The incident, when fully related, instead of showing that the engineer was incompetent, showed just the reverse; that he was quick to observe and to comprehend that he could not go into the siding from the north end because of the

loaded cars, but must go in as he did go in, even according to the testimony of the plaintiff, by backing in from the south.    We think the judge might very properly have instructed the jury that plaintiff had failed to show such incompetency of the engineer as to make it the duty of the defendant to discharge him.    Having reached this conclusion, it is not necessary to pass upon the other questions.

Judgment is reversed, and new trial ordered.

OSTRANDER, C. J., and BIRD, STEERE, McALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.